**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DELMAS COPLEY,**

      **Plaintiff,**

**v.**                             **Case No.: 3:14-cv-18270**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, seeking judgment in her favor. (ECF Nos. 10 & 11).

The undersigned has fully considered the evidence and the arguments of counsel.

1

For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On July 29, 2011 and November 29, 2012, Plaintiff Delmas Copley ("Claimant"), filed applications for DIB and SSI, respectively, alleging a disability onset date of April 7, 2011, (Tr. at 13, 197), due to low back pain, high blood pressure, diabetes, heart blockage, anxiety, leg pain, elbow pain, high cholesterol, and neck pain.[1] (Tr. at 228). The Social Security Administration ("SSA") denied Claimant's DIB application initially and upon reconsideration. (Tr. at 113-16, 118-24). On April 9, 2012, Claimant filed a request for an administrative hearing related to the denial of his application for DIB, (Tr. at 125), and at some point before the hearing was held, the SSA apparently elevated Claimant's SSI application to the administrative hearing level, as the ALJ's written decision reflects that he considered both applications. (Tr. at 13). The administrative hearing was held on February 19, 2013 before the Honorable Jerry Meade Administrative Law Judge ("ALJ"). (Tr. at 56-71). At that hearing, the ALJ decided to schedule a supplemental hearing to consider additional evidence submitted by Claimant, which was conducted on August 8, 2013. (Tr. at 72-86). By written decision dated September 4, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-26). The ALJ's decision became the final decision of the Commissioner on May 7, 2014, when the Appeals Council denied Claimant's request

---

[1] Claimant's SSI application is not in the administrative record.

for review.[2] (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 54 years old at the time that he filed the application for DIB benefits, 55 years old at the time he filed the application for SSI benefits, and 56 years old on the date of the ALJ's decision. (Tr. at 13, 26, 197). He is a high school graduate and communicates in English. (Tr. at 60, 227, 229). Claimant has previously worked as a carpenter in construction. (Tr. at 60, 214-15, 229).

## III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be

---

[2] In denying Claimant's request for review, the Appeals Council acknowledged that since the date of ALJ Meade's decision, Claimant was found to be disabled as of September 5, 2013 based on a September 11, 2013 application. (Tr. at 2). However, the Appeals Council found that this subsequent favorable decision did not warrant a change in ALJ Meade's September 4, 2013 decision. (*Id.*) Claimant has not argued to this Court that the SSA's subsequent favorable decision requires remand of the unfavorable September 4, 2013 decision. Notwithstanding, a subsequent award of benefits **alone** does not require remand of a previous unfavorable decision. *Mannon v. Colvin,* No. 3:12-cv-07725, 2013 WL 5770524, at *17-*19 (S.D.W.Va. Oct. 24, 2013). Furthermore, Claimant has not provided the Court with any new and material evidence that *supported* the subsequent favorable decision. *See id.* at *19. In this case, the only additional evidence that Claimant supplied to the Appeals Council and that was made a part of the administrative record is a report of a February 2014 MRI of Claimant's cervical spine, which is discussed herein. (Tr. at 2, 5, 714).

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to

4

perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe,

the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 7, 2011, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "obesity; diabetes mellitus; medial meniscus tear of the right knee, status post-surgical repair; osteoarthritis; and mild degenerative disc disease of the cervical, thoracic and lumbar spine." (Tr. at 15-16, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of high blood pressure, high cholesterol, chest pain, elbow pain, bowel and bladder problems, anxiety, and depression. (Tr. at 15-16). However, the ALJ found these alleged impairments to be non-severe or not medically determinable. (*Id.*)

6

Under the third inquiry, the ALJ concluded that Claimant did not have any impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-17, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can frequently push and pull and operate foot controls with the right lower extremity; can occasionally climb ladders, ropes and scaffolds; can frequently (but not repetitively) stoop, kneel, crouch and crawl; and must avoid concentrated exposure to excessive vibration.

(Tr. at 17-24, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 24, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 24-25, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1957, and was defined as an individual closely approaching advanced age on the alleged disability onset date, but subsequently changed age category to advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because using the Medical-Vocational Rules as a framework supported a finding that the Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 24, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy, including work as a packer, stock clerk, or janitor at the medium exertional level, and as a product inspector, ticket marker/pricer, or packer at the light exertional level. (Tr. at 24-25, Finding No. 10). Therefore, the ALJ found that Claimant

was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 26, Finding No. 11).

## IV.   <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ failed to fully develop the medical evidence related to Claimant's shoulder pain, diabetes mellitus Type II, hypertension, osteoarthritis, and cervical, thoracic, and lumbar spine pain. (ECF No. 10 at 13). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [his] multiple medical problems," the ALJ could not properly analyze his impairments as required by the Regulations. (*Id.* at 15). Interspersed in Claimant's criticism regarding the development of the record is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians." (*Id.* at 14). Claimant insists that the ALJ "ignored" the opinions of his treating physician, William Jennings, M.D.,[3] and two consultative examiners, Kip Beard, M.D., and Michael Kilkenny, M.D.[4] (*Id.* at 14-15). In his second challenge, Claimant argues that "the ALJ failed to consider and properly evaluate [his] claim under the combination of impairments theory." (*Id.* at 15). Claimant contends that his "medical and mental problems," when considered in combination, support a finding of disability. (*Id.* at 15-16). He asserts that the combination of his impairments meet or equal "the listing for disability." (*Id.* at 15). In support of his contention, Claimant cites the opinions provided by Dr. Jennings, Dr. Beard, and Dr. Kilkenny. (*Id.* at 16). Within

---

[3] Throughout his brief, Claimant refers to Dr. Jennings as "Dr. Jennys."

[4] Dr. Beard performed an Internal Medicine Examination for the Department for Disability Determination in Kentucky, and Dr. Kilkenny performed an examination for the Medical Review Team of the West Virginia Department of Health and Human Resources. Claimant has not identified any "record-reviewing state physicians" whose opinions were adopted by the ALJ.

his second argument, Claimant again includes a criticism of the ALJ's consideration of the opinions of his treating physician and the consultative examiners. (*Id.* at 16).

In response, the Commissioner maintains that the ALJ did not fail to develop the record and points out that Claimant had the burden to present evidence of his alleged disability. (ECF No. 11 at 12, 17). In addition, the Commissioner asserts that Claimant has not proffered what additional medical records, tests, or examinations would have changed the outcome of this case. (*Id.* at 17). As for Claimant's intermixed treating physician argument, the Commissioner avers that the ALJ properly evaluated the opinion evidence, and to the extent that certain opinions were not assigned significant weight by the ALJ, those opinions were not supported by the medical record. (*Id.* at 14-17). For instance, with regard to Dr. Jennings's physical RFC opinion, the Commissioner argues that the doctor's opinion is internally inconsistent and lacks any explanation for the limitations provided. (*Id.* at 16-17). Moreover, according to the Commissioner, the "vast majority" of Claimant's treatment with Dr. Jennings related to his diabetes, and Dr. Jennings's opinion as to Claimant's physical limitations extends beyond that condition. (*Id.*) In relation to Dr. Kilkenny, the Commissioner claims that his opinion is "devoid of objective findings," is "based solely upon [Claimant's] subjective complaints," and is "inconsistent with the medical record." (*Id.* at 16). As for Dr. Beard's opinion, the Commissioner asserts that the ALJ's RFC determination is consistent with Dr. Beard's findings and that additional limitations are not supported by the medical evidence. (*Id.* at 14-15). With respect to Claimant's second challenge, the Commissioner argues that Claimant has failed to identify any specific listing that his alleged impairments might meet. (*Id.* at 19).

## V. <u>Relevant Medical History</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records Prior to the Alleged Onset Date

Claimant began treatment with Allen Young, M.D., at St. Mary's Occupational Health Center, on February 16, 2005, for a work injury he sustained to his upper and lower back. (Tr. at 485). Claimant indicated that while carrying a walk board above his head, he twisted and felt pain, which gradually worsened throughout the day. (*Id.*) He described pain in both sides of his lumbar spine and the right side of his thoracic spine, which radiated into both of his legs. (*Id.*) Claimant reported no prior history of back problems, depression, or anxiety. (Tr. at 485-86). Upon examination, Claimant appeared to be in moderate discomfort. (Tr. at 486). Claimant's judgment, insight, orientation, speech, and affect were normal and appropriate. (Tr. at 487). Dr. Young noted that Claimant's gait and station were normal, and there was mild weakness on Claimant's right side with knee extension. (Tr. at 487). Dr. Young's examination of Claimant's back revealed moderate tenderness in the bilateral lumbar paraspinal muscles at the L4-5 level and the right T8-12 level. (*Id.*) Claimant experienced no sciatic notch tenderness, and a straight leg raise test was negative. (*Id.*) Dr. Young recorded that Claimant's active range of motion measured thirty degrees for forward flexion, five degrees for extension, fifteen degrees for lateral flexion, and twenty degrees for rotation. (*Id.*) An x-ray revealed no acute bony abnormalities of the thoracic and lumbar spine, but did show some minor degenerative changes. (*Id.*) Dr. Young diagnosed Claimant with lumbar and thoracic region sprain, which he believed could take up to six weeks to

completely resolve. (*Id.*) Dr. Young instructed Claimant to continue taking medication previously prescribed to him, including a non-steroidal anti-inflammatory medication, a muscle relaxer, and pain medication. (*Id.*) In addition, Dr. Young recommended that Claimant begin physical therapy. (*Id.*)

Claimant continued to treat with Dr. Young for his back pain throughout 2005. (Tr. at 470-84). On February 21, 2005, Claimant reported that his symptoms were the same and that he had experienced little relief from medication and physical therapy. (Tr. at 482). At that visit, Dr. Young recorded findings similar to those at the previous visit and ordered an MRI of the lumbar spine. (Tr. at 483). One week later, Claimant informed Dr. Young that his pain medications were helping some. (Tr. at 479). Dr. Young noted improved forward flexion and extension. (Tr. at 480). On March 7, 2005, Dr. Young indicated that the MRI of Claimant's lumbar spine was negative for herniated discs and nerve impingement. (Tr. at 477). Dr. Young noted that Claimant reported improvement with his lower and upper back, and Claimant's active range of motion in his back had improved. (Tr. at 476-77). On March 29, 2005, Claimant reported his low back had improved, but he continued to experience a dull ache. (Tr. at 473). However, there was less stiffness in the low back, and Claimant stated that he was not experiencing leg or upper back pain. (*Id.*) Claimant told Dr. Young that he was feeling a lot better and participating in physical therapy, which he believed continued to help. (*Id.*) Dr. Young recommended that Claimant continue taking his medications as needed and attending physical therapy. (Tr. at 474). On April 11, 2005, Claimant again reported improvement with his low back symptoms, but he continued to have some pain in the evenings after work. (Tr. at 470). Claimant told Dr. Young that he had gone back to work one week prior, and even though his back hurt initially, he was still able to dig a ditch all

11

day on the date of his appointment with little pain. (*Id.*) Claimant stopped attending physical therapy after returning to work; however, he continued to take Robaxin and Ultram in the evenings. (*Id.*) Claimant's diagnosis remained unchanged, and Dr. Young opined that Claimant's soft tissue injury had mostly resolved. (Tr. at 471). Dr. Young recommended that Claimant continue taking his prescribed medication as needed, continue home physical therapy, and continue with his regular work duty. (*Id.*) Dr. Young discharged Claimant at the visit with an instruction to return as needed. (*Id.*)

Claimant returned to Dr. Young on June 21, 2007, for treatment of a work-related injury. (Tr. at 467). Claimant reported that, while carrying a piece of metal, he tripped, externally rotating his right knee and twisting his lower back. (*Id.*) His primary complaint was knee pain, swelling, and instability. (*Id.*) Dr. Young noted Claimant had been doing well with regard to his prior back injury until his latest work accident. (*Id.*) Dr. Young assessed Claimant with knee, leg, lumbar spine, and thoracic spine sprains. (Tr. at 469). Dr. Young opined that Claimant's injuries were likely soft tissue injuries that could take up to six weeks to heal. (*Id.*) He recommended that Claimant attend physical therapy for his back and wear a knee brace. (*Id.*) Dr. Young also ordered an MRI of the knee and prescribed a non-steroidal anti-inflammatory medication. (*Id.*)

On June 25, 2007, Claimant underwent a physical therapy evaluation by Heather Harr, PT, at St. Mary's Occupational Health Center. (Tr. at 465-66). Claimant described his back pain as an eight out of ten and also complained of right knee pain. (Tr. at 465). In addition, Claimant indicated that he was experiencing radiating pain to the left ankle along with numbness and tingling. (*Id.*) Ms. Harr recorded that Claimant's active range of motion in the lumbar spine was eight degrees for flexion and ten degrees for extension. (*Id.*) Ms. Harr noted that Claimant's left lower extremity strength was five out

of five, but she was unable to test his right lower extremity due to pain. (*Id.*) Ms. Harr observed that Claimant was tender to palpation of the bilateral lumbar paraspinal region, bilateral hips, and posterior right thigh. (*Id.*) Claimant was assessed with increased pain, decreased active range of motion, and decreased function. (*Id.*) Ms. Harr recommended that Claimant attend physical therapy three times each week for four weeks. (Tr. at 466). Claimant continued physical therapy with Ms. Harr throughout June and July 2007, during which time he reported right lower extremity pain and low back pain. (Tr. at 460-61, 464).

Claimant returned to Dr. Young on June 28, 2007, and reported that his knee continued to be painful with mild swelling and locking. (Tr. at 462). He also informed Dr. Young that his back continued to hurt, but it was improving. (*Id.*) Dr. Young believed that Claimant's knee symptoms indicated a cartilage injury, and so he ordered an MRI of the right knee. (Tr. at 463). He instructed Claimant to continue taking medication, attending physical therapy, and wearing a knee brace. (*Id.*)

On July 3, 2007, Dr. Young informed Claimant that the MRI of his right knee revealed a tear in the medial meniscus. (Tr. at 458). Dr. Young ordered an orthopedic consultation to explore the possibility of surgery on Claimant's right knee. (*Id.*) In addition, Dr. Young ordered an MRI of the lumbar spine since Claimant's complaints, including numbness of his legs, continued. (Tr. at 458). Claimant was prescribed baclofen and hydrocodone at that visit, and he was ordered to stop physical therapy. (*Id.*)

On July 17, 2007, Dr. Young noted that Dr. Tao would be performing surgery on Claimant's right knee. (Tr. at 454). Claimant continued to complain of low back pain with occasional pain in the legs. (*Id.*) He told Dr. Young his legs occasionally gave out, as

did his right knee. (*Id.*) Dr. Young observed that an MRI of Claimant's low back was similar to the March 2005 MRI, with slightly worse degenerative changes noted. (Tr. at 455). Dr. Young opined that Claimant's low back would gradually heal, especially once the right knee surgery was completed. (*Id.*)

Beginning August 13, 2007 through January 3, 2008, Claimant underwent physical therapy as prescribed by Dr. Tao with Tri-State Rehab Services of Westmoreland. (Tr. at 290, 301-24, 326-49). At Claimant's initial evaluation, Craig S. Buell, MSPT, noted that Claimant reported a prior medical history of low back pain, arthritis, diabetes, and high cholesterol. (Tr. at 348). Mr. Buell indicated that Claimant had undergone surgery on his right knee on August 6, 2007. (*Id.*) Claimant informed Mr. Buell that he was not using crutches; however, he was taking pain medication and icing his knee. (*Id.*) At rest, Claimant described his pain as a seven out of ten while his pain increased to a nine out of ten with extended ambulation. (*Id.*) Mr. Buell opined that Claimant had good rehabilitation potential. (*Id.*) By September 7, 2007, Claimant reported that his pain had decreased to a three or four out of ten. (Tr. at 338).

Claimant returned to Dr. Young on September 11, 2007. (Tr. at 452-53). Claimant reported that he felt his knee had improved as a result of the surgery, but it still bothered him. (Tr. at 452). Claimant informed Dr. Young that he continued to have pain with weight bearing and that his knee pain disrupted his sleep. (*Id.*) He had also begun using weights during physical therapy, but that caused pain in his low back. (*Id.*) Claimant was advised to continue physical therapy for four more weeks and to continue taking hydrocodone. (Tr. at 453).

On October 1, 2007, Claimant stated to Dr. Young that his knee had been slowly improving until he tried to climb a ladder, which made his knee feel worse. (Tr. at 450).

Claimant indicated that he performed the same type of activity in therapy without any aggravation. (*Id.*) Additionally, Claimant continued to report low back pain. (*Id.*) Dr. Young advised Claimant to continue physical therapy for treatment of the knee for two more weeks. (Tr. at 451). If no improvement was seen in the low back, Dr. Young would consider physical therapy for that condition as well. (*Id.*) Dr. Young recommended that Claimant continue taking hydrocodone. (*Id.*)

Two weeks later, on October 15, 2007, Claimant again visited Dr. Young and reported that his knee was still bothering him. (Tr. at 447). However, Dr. Young opined that Claimant's knee was showing a lot of improvement. (Tr. at 448). Consequently, Dr. Young recommended that Claimant discontinue therapy for the knee and begin physical therapy for his lower back. (*Id.*) A little less than one month later, on November 13, 2007, Claimant returned to Dr. Young and indicated that both his knee and his lower back symptoms had improved, but not fully resolved. (Tr. at 445). Dr. Young advised Claimant to continue physical therapy for an additional four weeks and to continue taking hydrocodone. (Tr. at 446).

On January 3, 2008, Claimant attended physical therapy at Tri-State Rehab Services of Westmoreland. (Tr. at 290). Claimant indicated that he was pain free on that date and felt better since he started work hardening and conditioning. (*Id.*) The therapist noted that Claimant tolerated treatment well and was making progress. (*Id.*)

On January 15, 2008, Claimant reported to Dr. Young that he was not experiencing any knee pain or back pain that day. (Tr. at 443). Claimant stated that he was using weight machines for conditioning and reported feeling much better. (*Id.*) He also indicated that he was moving well and that he was not using any pain medications

at that time. (*Id.*) Given his improvement, Dr. Young released Claimant back to work and discharged him with an instruction to return if needed. (Tr. at 444).

On April 21, 2010, Claimant called the South Point Medical Center with complaints of dull chest pain that radiated to the mid back, left shoulder, and elbow. (Tr. at 417). He was advised to proceed to the emergency room. (*Id.*) He visited Susan Runyon, RN, at the South Point Medical Center the following day for a recheck of his Type II diabetes. (Tr. at 416). Claimant reported his blood sugars were in a good range, but he sometimes did not take insulin, which could make his blood sugar level as high as 242. (*Id.*) With insulin, Claimant's blood sugar measured around 120. (*Id.*) Claimant also reported feeling chest pressure and pain that radiated into the left side of his neck, his jaw, and his left arm. (*Id.*) Ms. Runyon noted that Claimant underwent a stress test in 2006, which was negative. (*Id.*) Upon examination, Ms. Runyon observed that Claimant weighed 195 pounds, his blood pressure was 130/90, his pulse was 68, and his heart rate and rhythm were regular. (*Id.*) Ms. Runyon assessed Claimant with Type II diabetes, hypertension, and chest pain. (*Id.*) She recommended that Claimant begin taking omeprazole and undergo a stress test. (*Id.*)

Claimant reported to St. Mary's Medical Center on May 13, 2010, for a stress test and myocardial perfusion test. (Tr. at 421-22). The stress test revealed a negative echocardiogram exercise treadmill stress test with no stress inducted chest pain, normal functional capacity, and a Duke treadmill score of +5. (Tr. at 421). The myocardial perfusion test was found to be within normal limits, and a preserved ejection fraction of fifty-eight percent was calculated. (Tr. at 422).

On March 1, 2011, Claimant was seen at South Point Medical Center for complaints of foot and joint pain. (Tr. at 411-12). Upon examination, Claimant was alert

with appropriate affect, and no musculoskeletal examination abnormalities were noted. (Tr. at 412). He was diagnosed with poorly controlled hypertension and Type II diabetes.[5] (Tr. at 412).

### B. Treatment Records Beginning on the Alleged Onset Date

On April 7, 2011, Claimant informed Dr. Young that he was digging a ditch at work earlier that day and felt a sharp pain in his mid-back while lifting a shovel full of mud. (Tr. at 373). He told Dr. Young that the pain had worsened throughout the day. (*Id.*) Dr. Young observed that the pain was located in the bilateral thoracic region of the spine with no radiation of pain, numbness, or tingling; however, Claimant did report stiffness. (*Id.*) At that visit, Claimant's current medications included metformin, omeprazole/benazepril hcl, Crestor, aspirin, and Lantus. (*Id.*) A review of systems was negative for joint pain, anxiety, and depression. (Tr. at 374). Upon examination, Dr. Young noted that Claimant was in moderate discomfort, but his judgment, insight, and affect were normal. (*Id.*) Claimant exhibited normal gait and station, as well as normal strength and tone in his upper and lower extremities. (*Id.*) Dr. Young did not observe any neurological abnormalities. (*Id.*) Claimant's neck was nontender and retained normal active range of motion. (*Id.*) Dr. Young recorded that Claimant experienced mild to moderate tenderness in the bilateral paraspinal muscles at the thoracic 8-10 level along with spinous tenderness at the T10 level. (*Id.*) A straight leg raise was negative, but Dr. Young found that there was a loss of movement in Claimant's lower back as a result of tightness in the upper back. (*Id.*) An x-ray of the thoracic spine taken that day was normal. (Tr. at 375). Claimant was diagnosed with sprain to the thoracic region.

---

[5] The record for this visit is partially illegible, but it also appears that Claimant was diagnosed with hyperlipidemia and plantar fasciitis. (Tr. at 412).

(*Id.*) Dr. Young opined that this was a soft tissue injury that could take up to six weeks completely resolve. (*Id.*) Claimant was prescribed muscle relaxants and given a list of stretches to perform, which would increase function and decrease pain. (*Id.*)

Claimant returned to Dr. Young on April 11, 2011, and stated that he was feeling worse. (Tr. at 377). Claimant described pain over his entire spine along with spasm and stiffness "all the way down." (*Id.*) He also reported a burning sensation in his neck. (*Id.*) Claimant further indicated that muscle relaxers had not helped. (*Id.*) Upon examination, Dr. Young observed that Claimant's gait and station were normal. (Tr. at 378). Dr. Young noted moderate bilateral paraspinal tenderness at C5-7 and limited active range of motion in Claimant's neck. (*Id.*) Dr. Young also recorded mild to moderate tenderness in the bilateral paraspinal muscles from T1-L5 as well as spinous tenderness at T10. (*Id.*) A straight leg raise was again negative. (*Id.*) Range of motion in Claimant's back was overall worse than his last visit with forward flexion at twenty degrees, extension at five degrees, lateral flexion at fifteen degrees bilaterally, and rotation at fifteen degrees. (*Id.*) There were no abnormal neurological or psychiatric findings. (*Id.*) Dr. Young's assessment remained the same, and he recommended physical therapy in addition to muscle relaxers. (*Id.*)

On April 14, 2011, Claimant returned to Tri-State Rehab Services of Westmoreland for an evaluation with Mr. Buell. (Tr. at 284-85). Claimant reported pain in the thoracic spine extending toward the neck and down the low back, and he described the pain as a ten out of ten. (Tr. at 284). Mr. Buell noted that active range of motion of Claimant's spine was twenty-five to fifty percent of what was to be expected. (*Id.*) On palpation, Claimant exhibited significant muscle spasm and guarding throughout the thoracic spine. (*Id.*) Claimant's shoulder flexion, abduction, and

18

retraction were 3/5 in both shoulders. (*Id.*) Mr. Buell opined that Claimant had good rehabilitation potential, and he treated Claimant that day with modalities and therapeutic exercises. (*Id.*) Claimant returned to Tri-State Rehab Services the next day where he performed range of motion exercises and received electronic stimulation therapy. (Tr. at 283). The therapist rated Claimant's performance as good and opined that Claimant was benefitting from physical therapy. (*Id.*)

On April 18, 2011, Claimant reported to Dr. Young that after two physical therapy treatments, he did not experience any relief and was not improving. (Tr. at 440). He further indicated that he was feeling some burning in his right upper arm. (*Id.*) In addition, Claimant told Dr. Young that medication was not helping and that the steroids had caused his glucose level to rise, so he stopped taking them. (*Id.*) Upon examination, Dr. Young noted that Claimant's neck symptoms were the same and that Claimant experienced mild to moderate tenderness in the bilateral paraspinal muscles from T1-T12 as well as T10 spinous tenderness. (Tr. at 441). A straight leg raise was negative, and range of motion in the back was the same as Claimant's previous visit. (*Id.*) Dr. Young recorded no neurological or psychiatric abnormalities. (*Id.*) Claimant's diagnosis remained the same, and he was advised to take Zanaflex and continue physical therapy. (Tr. at 441-42).

Claimant returned to Tri-State Rehab Services on April 22, 2011. (Tr. at 282). Claimant stated that he had been performing his home exercise program and reported that he felt he was making progress. (Tr. at 282). The therapist rated Claimant's performance at that appointment as good and opined that Claimant was benefitting from physical therapy. (*Id.*) At his April 26, 2011 physical therapy appointment, Claimant described his pain as a nine out of ten and indicated that muscle relaxers

offered temporary relief. (Tr. at 281). He also stated that he had been complying with his home exercise program. (*Id.*) Claimant's therapist recorded that Claimant's tolerance to treatment was fair and that no significant improvement was observed yet, but Claimant should continue physical therapy. (*Id.*)

Claimant returned to Dr. Young on April 27, 2011 reporting no improvement. (Tr. at 380). He continued to complain of stiffness and pain, mostly between the scapulae with diffuse pain in the upper thoracic spine and neck down to the low back. (*Id.*) Dr. Young's findings were identical to those recorded at Claimant's last visit. (Tr. at 381). He assessed Claimant with a thoracic region sprain, neck sprain, and lumbar sprain. (*Id.*) Dr. Young recommended that Claimant stop physical therapy and start chiropractic therapy. (*Id.*) He further instructed Claimant to continue taking a muscle relaxer and to begin taking hydrocodone. (Tr. at 381-82). Dr. Young also ordered an MRI of Claimant's thoracic spine. (Tr. at 381).

On May 1, 2011, Claimant began treatment for back pain with Michael Fredrick, D.C. (Tr. at 279-80, 370-72). Claimant described his back pain as constant, burning, dull, tingling, and aching. (Tr. at 279). He further stated that his pain was a nine out of ten and that it affected his ability to sit, stand, walk, bend, and lie down. (*Id.*) On May 2, 2011, Claimant presented to Dr. Fredrick with normal ambulation and good appearance. (Tr. at 367). A Romberg test, finger to thumb test, and finger to nose test were all negative. (*Id.*) Cervical spine spondylosis was not observed. (*Id.*) When testing for range of motion in the cervical spine, Dr. Fredrick noted that all cervical motion produced pain and that Claimant's range of motion was ten to thirty-five degrees below normal. (Tr. at 368). After reviewing x-rays of Claimant's cervical, thoracic, and lumbar spine, Dr. Fredrick diagnosed Claimant with a thoracic sprain. (Tr. at 372).

20

On May 3, 2011, Claimant underwent an MRI of his thoracic spine at St. Mary's Medical Center as ordered by Dr. Young. (Tr. at 656). The MRI revealed minimal degenerative changes to the mid and lower dorsal spine and at the cervicothoracic junction. (*Id.*) There was no evidence of canal stenosis, neural impingement, or disc herniation. (*Id.*)

Claimant returned to Dr. Young on May 4, 2011, and reported that he was doing better after attending two chiropractic appointments. (Tr. at 383). Dr. Young noted that Claimant was showing improvement in his movement and that Claimant looked better. (Tr. at 383-84). Dr. Young's examination of Claimant's back revealed mild to moderate tenderness in the bilateral paraspinal muscles from T5-T12, but no spinous tenderness or sciatic notch tenderness was found. (Tr. at 384). A straight leg test was negative, and active range of motion of the back was improved. (*Id.*) In relation to Claimant's neck, he exhibited some mild bilateral paraspinal tenderness at C7, but not spinous tenderness. (*Id.*) Dr. Young recorded that the musculoskeletal, neurological, and psychiatric examinations were otherwise normal. (*Id.*) Claimant's diagnosis remained unchanged, and Dr. Young opined that chiropractic treatment, in combination with more time, would enable Claimant to continue to improve. (Tr. at 384-85). Dr. Young recommended that Claimant continue taking hydrocodone. (Tr. at 385).

Claimant also attended a chiropractic appointment with Dr. Fredrick that same day. (Tr. at 366). Claimant indicated that he was experiencing pain between his shoulders, but his neck felt a little better. (*Id.*) Dr. Fredrick recorded that Claimant was improving, but experiencing some back tenderness. (*Id.*) He recommended that Claimant continue treatment. (*Id.*) At an appointment two days later, Claimant informed Dr. Fredrick that his mid back and low back felt a little better, but he was still

tender to palpation of the back. (Tr. at 365). Dr. Fredrick again noted improvement and recommended that Claimant continue chiropractic treatment. (*Id.*)

On May 16, 2011, Claimant returned to Dr. Young and indicated that he was experiencing less pain, but still had some stiffness. (Tr. at 386). Dr. Young observed that Claimant looked like he felt better. (Tr. at 387). He observed that Claimant experienced mild bilateral paraspinal tenderness at C7 with no spinous tenderness and that range of motion of Claimant's neck was limited by upper back pain. (*Id.*) Examination of Claimant's back revealed less pain with movement, but movement itself was slightly worse than before. (*Id.*) Musculoskeletal, neurological, and psychiatric examinations were all found to be otherwise normal. (*Id.*) Dr. Young assessed Claimant with a sprain of the thoracic region and lumbar spine. (*Id.*) He advised Claimant to continue taking hydrocodone and receiving chiropractic treatment. (Tr. at 387-88).

By letter dated May 18, 2011, Dr. Fredrick wrote to Brick Street Insurance regarding Claimant's work-related injury and treatment. (Tr. at 369). He reported that x-rays of the upper back and neck revealed an abnormality in the upper cervical vertebrae, at the atlas, which Dr. Fredrick opined could be contributing to Claimant's condition. (*Id.*) He requested authorization for an MRI of Claimant's upper cervical area for further diagnostic purposes. (*Id.*) At a June 1, 2011 chiropractic appointment, Claimant informed Dr. Fredrick that he "hurt all over." (Tr. at 361). Dr. Fredrick noted some palpable tenderness in Claimant's back, but opined that Claimant was improving and should continue receiving treatment. (*Id.*)

Defendant presented to South Point Medical Center on June 2, 2011, for treatment of uncontrolled Type II diabetes. (Tr. at 405-06). The treater noted that Claimant had been "noncompliant." (Tr. at 406). Claimant was counseled on weight loss

and exercise, and he was prescribed Humalog. (*Id.*)

Claimant again visited Dr. Young on June 13, 2011. (Tr. at 389). At that time, Claimant had not received chiropractic treatment for two weeks and reported a lot of pain and stiffness with movement. (*Id.*) Claimant mostly complained of lower thoracic spine and upper lumbar spine pain, but he did not report any radiating pain. (*Id.*) Dr. Young noted that Claimant experienced mild bilateral paraspinal tenderness at C7 and mild to moderate bilateral paraspinal tenderness from T10-L3. (Tr. at 390). A straight leg raise test was negative, but range of motion was worse in Claimant's back. (*Id.*) Musculoskeletal, neurological, and psychiatric findings were all otherwise normal. (*Id.*) Dr. Young recommended physical therapy and prescribed Zanaflex and tramadol. (Tr. at 391).

On June 16, 2011, Claimant attended physical therapy at Riverside Physical Therapy. (Tr. at 514). The therapist noted that Claimant was diagnosed with thoracic and lumbar injuries, and recommended that Claimant attend physical therapy three times each week for four weeks. (*Id.*) On June 20, 2011, Claimant presented to Riverside Physical Therapy with complaints of upper cervical spine, upper thoracic spine, and low back pain. (Tr. at 512). On June 24, 2011, Claimant again reported experiencing low back pain. (*Id.*) On June 27, 2011, Joe Lambiotte, PT, reported to Dr. Young that Claimant was making good progress in physical therapy; however, Claimant continued to complain of pain and stiffness at L5/S1, which radiated down his left hip. (Tr. at 513). In addition, Mr. Lambiotte stated that Claimant's mid thoracic pain was decreasing with exercise. (*Id.*)

Claimant returned to Dr. Young on June 27, 2011, and indicated that after two weeks of physical therapy, he had less pain and was moving better. (Tr. at 392).

23

Claimant also stated that the pain was in his mid-back and did not radiate elsewhere. (*Id.*) Dr. Young noted no abnormal findings during musculoskeletal, neurological, and psychiatric examination. (Tr. at 393). He observed mild tenderness in the bilateral paraspinal muscles at T8-12. (*Id.*) A straight leg raise test was negative, and range of motion of Claimant's back was improved. (*Id.*) Dr. Young recommended that Claimant continue attending physical therapy. (*Id.*)

On July 5, 2011, Claimant reported to his physical therapist that he was experiencing an increase in low back pain, which radiated down his left leg to the knee. (Tr. at 510). The following day, Claimant reported a decrease in low back pain and described his pain as a six out of ten. (*Id.*) On July 7, 2011, Claimant state that his low back pain had decreased, but he was still experiencing some back pain radiating into his left hip. (*Id.*) He expressed to the therapist that since starting physical therapy, he had noticed improvement with motion as well as his level of pain. (*Id.*) On July 11, 2011, Mr. Lambiotte informed Dr. Young that Claimant was making good progress with physical therapy; however, Claimant continued to complain of low back pain as well as pain down the left leg. (Tr. at 511).

Claimant again treated with Dr. Young on July 11, 2011. (Tr. at 395). He stated that he was doing better and that his pain was mostly in his mid-back. (*Id.*) Upon examination, Dr. Young noted that Claimant's movement was better, but he still experienced pain with extension. (Tr. at 396). Dr. Young recorded that musculoskeletal, neurological, and psychiatric findings were all otherwise normal. (*Id.*) He recommended that Claimant continue physical therapy and begin a trial of working regular duty beginning August 1, 2011. (*Id.*)

On July 13, 2011, Claimant reported to his physical therapist that he experienced an increase in low back pain after undergoing an independent medical examination. (Tr. at 510). Two days later, Claimant again described an increase in low back pain along with stiffness. (Tr. at 508). On July 22, 2011, Claimant stated to his physical therapist that his low back pain had decreased. (*Id.*) On July 29, 2011, Claimant again described low back pain and stated that he felt the pain was not improving. (Tr. at 507).

On August 9, 2011, Claimant presented to Natavoot Chongswatdi, M.D., for an evaluation related to his workers' compensation claim. (Tr. at 429-32). Claimant indicated that he had returned to work on August 2. (Tr. at 429). Dr. Chongswatdi noted that physical therapy had improved Claimant's pain, but he still experienced minimal upper thoracic spine and neck pain as well as low back pain. (Tr. at 430). Upon examination, Dr. Chongswatdi recorded that Claimant was sixty-five inches tall and weighed 204 pounds with a body mass index of thirty-four. (Tr. at 431). Dr. Chongswatdi observed paraspinal muscle spasm of the thoracic spine and lumbosacral spine on the right side. (*Id.*) In addition, Claimant exhibited point tenderness to the right thoracic paraspinous muscle at the shoulder blade. (Tr. at 432). However, Dr. Chongswatdi also noted that Claimant's thoracic spine had a normal appearance with no evidence of instability. (Tr. at 431). Claimant's thoracolumbar spine also exhibited a normal appearance, as did his lumbosacral spine. (*Id.*) There was no tenderness to palpation of the lumbosacral spine, and Dr. Chongswatdi recorded that flexion, rotation, and extension of Claimant's lumbosacral spine were all normal. (Tr. at 431-32). Dr. Chongswatdi further observed that Claimant had no neurological deficits and good range of motion. (Tr. at 432). Dr. Chongswatdi deemed the remainder of the examination "fairly normal." (*Id.*) Dr. Chongswatdi opined that Claimant had suffered a

thoracic sprain or strain, which could cause some pain in the neck and low back as well as spasms and muscle tightness. (*Id.*) Dr. Chongswatdi noted physical therapy was a good treatment option and that Claimant was working, which he appeared to be tolerating well with current medications. (*Id.*) Dr. Chongswatdi opined that Claimant should still be monitored to ensure that he was capable of working, but that he should begin to cut back on medication. (*Id.*) If Claimant's symptoms worsened, then Dr. Chongswatdi recommended additional physical therapy with progression to work hardening and conditioning. (*Id.*)

Claimant returned to South Point Medical Center for a checkup on August 15, 2011. (Tr. at 402). Claimant reported no problems and indicated that his blood sugar level was continuously in the 135 to 200 range. (*Id.*) Claimant requested that his treater start him on Victoza to treat his Type II diabetes, and his treater obliged. (Tr. at 402-03).

On August 30, 2011, Claimant returned to Dr. Chongswatdi and stated that shortly after returning to work, while bending over to rake concrete, he became dizzy and experienced spasms in his legs and feet. (Tr. at 426). He also described a burning sensation from his neck down his arms, nausea, and vomiting. (*Id.*) At the time of the visit, Claimant was experiencing headaches, burning down both arms, back pain, and neck pain. (*Id.*) Upon examination, Dr. Chongswatdi noted that Claimant's heart rate and rhythm were normal. (Tr. at 427). Claimant exhibited spasm of the trapezius muscle in the shoulder and reported tenderness on palpation of the cervical spine and paracervical muscles. (*Id.*) Dr. Chongswatdi also observed spasm of Claimant's paracervical muscle and decreased ranged of motion of the cervical spine. (*Id.*) However, Claimant's cervical spine appeared normal and exhibited no sign of instability

26

or weakness. (*Id.*) In addition, Dr. Chongswatdi noted that the right side of Claimant's thoracic spine exhibited a spasm of the paraspinal muscles as did the right side of Claimant's lumbosacral spine. (*Id.*) Dr. Chongswatdi assessed Claimant with headache, neck sprain, thoracic sprain, neck strain, and thoracic strain. (*Id.*) He opined that Claimant's nausea and dizziness could be attributed to heat exhaustion and dehydration. (*Id.*) He also concluded that the neck pain, headaches, and arm numbness could have resulted from a muscle strain in the neck and shoulder area. (*Id.*) Dr. Chongswatdi ordered physical therapy and occupational therapy for the neck strain, and he recommended that Claimant take ibuprofen 800 mg in addition to a muscle relaxer. (*Id.*) He also indicated that he would consider ordering Claimant not to work until September 15, 2011. (*Id.*)

On September 15, 2011, Claimant returned to South Point Medical Center for a check of his blood sugar level. (Tr. at 612-13). It continued to range from 150 to 200 with no episodes of hypoglycemia. (Tr. at 612). The treatment note indicated that Claimant was responding to treatment as expected. (Tr. at 613).

Claimant again visited Dr. Chongswatdi on September 29, 2011 complaining of pain in the middle back down to the lumbar region, which traveled down both legs with a burning sensation occasionally behind the knees. (Tr. at 423). Claimant indicated that his pain was constant and described it as a seven out of ten. (*Id.*) Claimant reported that the pain lessened after moving around and loosening his back, but certain motions, such as bending, made his back feel worse. (Tr. at 424). Claimant stated that he could not return to work as scheduled due to neck and back pain. (*Id.*) He reported that medication helped, but tended to wear off. (*Id.*) Dr. Chongswatdi's physical examination findings remained the same, and he assessed Claimant with thoracic sprain and lumbar

strain. (Tr. at 424-25). He recommended conservative treatment for Claimant's neck strain including physical and occupational therapy as well as medication, including ibuprofen, baclofen, and tramadol. (Tr. at 425). Dr. Chongswatdi also stated that he would consider restricting Claimant from work until October 15, 2011. (*Id.*)

On October 6, 2011, Claimant visited South Point Medical Center complaining that he felt nervous and that his blood sugar was starting to "creep up." (Tr. at 610). The treater noted that Claimant was "fighting" for a workers' compensation claim and that he was upset that he was not able to work. (*Id.*) Claimant also expressed feelings of depression. (*Id.*) Claimant was diagnosed with situational depression and Type II diabetes. (Tr. at 611). While the record from the visit is somewhat illegible, it appears Claimant was prescribed Effexor for his situational depression. (*Id.*)

Claimant treated with Dr. Young on October 17, 2011. (Tr. at 583). He reported experiencing back pain on both sides of his mid to low back with stiffness and pain. (*Id.*) He also described pain at the base of his neck radiating to his arms. (*Id.*) Examination of Claimant's neck revealed mild to moderate tenderness bilaterally in the paraspinal muscles at C5-7 with no spinous tenderness. (Tr. at 584). Dr. Young noted that Claimant's gait and station were normal. (*Id.*) The strength and tone of Claimant's upper and lower extremities were also normal. (*Id.*) Dr. Young observed that Claimant's judgment, insight, orientation, and affect were normal. (*Id.*) He further indicated that neurological findings were normal. (*Id.*) With regard to Claimant's back, Dr. Young observed that Claimant demonstrated moderate tenderness in the bilateral paraspinal muscles at T8-T12 and L3-5. (*Id.*) There was no spinous or sciatic notch tenderness, and a straight leg raise test was negative. (*Id.*) Dr. Young noted that movement was worse with pain at the end of Claimant's range of motion. (*Id.*) Dr. Young assessed Claimant

with a sprain of the thoracic region, a sprain of the lumbar spine, and a neck sprain. (*Id.*) He recalled that when he last saw Claimant in July 2011, Claimant still had mid and low back pain, but he had greatly improved with therapy and had gone back to work. (*Id.*) However, Claimant sustained a pulling injury August 25, 2011, which exacerbated the back pain in addition to causing a new injury to his neck. (*Id.*) Dr. Young recommended that Claimant attend physical therapy for his back and estimated that Claimant would return to work by November 21, 2011. (*Id.*)

Claimant returned to Dr. Young on October 31, 2011 with no change in his symptoms. (Tr. at 586). Claimant complained of stiffness in his neck and back making movement difficult. (*Id.*) Dr. Young's findings remained the same as the last visit, as did his diagnosis of Claimant's condition. (Tr. at 587). Dr. Young indicated that he may consider chiropractic treatment rather than physical therapy. (*Id.*) On November 14, 2011, Dr. Young ordered physical therapy three times per week for four weeks. (Tr. at 505).

On November 14, 2011, Claimant underwent an MRI of the lumbar spine at St. Mary's Medical Center. (Tr. at 655). Roger Blake, M.D., found that the MRI did not reveal any acute bony injury, focal disc herniation, or spinal canal stenosis. (*Id.*) He observed mild degenerative changes in the upper and lower spine, anteriorly in the upper lumbar spine and posteriorly in the lower lumbar spine. (*Id.*)

On November 15, 2011, Claimant returned to Riverside Physical Therapy to undergo an evaluation. (Tr. at 504). He then visited Dr. Young on November 17, 2011, and reported no change in his symptoms. (Tr. at 437). Dr. Young indicated that Claimant should stay with physical therapy, and if Claimant's symptoms did not improve, he would consider recommending chiropractic treatment. (Tr. at 438). Dr.

Young estimated Claimant could return to work on January 2, 2012. (*Id.*)

The following day, Claimant attended physical therapy and reported experiencing slight stiffness and soreness after his last session, but indicated that he was feeling a little better. (Tr. at 503). On November 22, 2011, Claimant reported a decrease in neck pain and headaches. (*Id.*) On December 6, 2011, Claimant returned to Dr. Young after having participated in approximately two weeks of physical therapy. (Tr. at 589). Claimant reported less pain and better movement. (*Id.*) He indicated that his headaches had resolved, but he continued to have pain between the scapula at T1-2. (*Id.*) Dr. Young opined that this was caused by the position Claimant held his neck in when experiencing neck pain. (*Id.*) Upon examination, Dr. Young observed that Claimant's gait and station were normal. (Tr. at 590). Dr. Young noted that Claimant's range of motion in the neck was much improved, but Claimant still experienced mild tenderness bilaterally in the paraspinal muscles at C5-T1. (*Id.*) Dr. Young noted no abnormal neurological and psychiatric findings. (*Id.*) He recommended that Claimant obtain an MRI of his cervical spine and stated that he would consider recommending additional physical therapy. (*Id.*)

On December 8, 2011, Claimant reported to his physical therapist that his neck felt "pretty good," but he continued to have some stiffness and soreness with cervical extension. (Tr. at 501). On December 19, 2011, Summer Chapman, PTA, from Riverside Physical Therapy wrote to Dr. Young informing him that Claimant was making good progress. (Tr. at 500). Ms. Chapman stated that Claimant's range of motion for flexion was sixty degrees and extension was sixty five degrees. (*Id.*) At his therapy session that day, Claimant reported his neck had continued to improve. (Tr. at 498).

The next day, December 20, 2011, Dr. Young noted that Claimant continued to improve with therapy and that his headaches had resolved. (Tr. at 591). Upon examination, Dr. Young noted that Claimant experienced less pain with neck movement. (Tr. at 592). Claimant was advised to continue with physical therapy as he demonstrated rapid improvement. (*Id.*) Dr. Young hoped that Claimant could return to work within a few weeks. (*Id.*)

On December 28, 2011, Claimant told his physical therapist that he had been in an awkward position for several hours while working on his car, which resulted in a very stiff neck. (Tr. at 498). He reported that since that time, he had experienced radiating pain down both of his arms to his elbows. (*Id.*) On December 30, 2011, Claimant reported a decrease in headaches and asserted that he was feeling better. (*Id.*)

Claimant again treated with Dr. Young on January 2, 2012. (Tr. at 593). He reported that his neck condition had worsened after performing simple arm movements. (*Id.*) Claimant described the pain as located on the left side of the base of his neck as well as in his upper thoracic spine and into his left trapezius. (*Id.*) Dr. Young noted that he had planned for Claimant to return to work that day, but Claimant was informed that he was laid off the prior week. (*Id.*) Upon examination, Dr. Young observed that Claimant had tenderness in the paraspinal muscles at C6-T2 and spinous tenderness at C7. (Tr. at 594). Dr. Young recommended that Claimant undergo an MRI of the cervical spine and chiropractic care; however, he informed Claimant that the workers' compensation carrier would likely deny both. (*Id.*) Claimant was prescribed Flexeril and prednisone. (*Id.*)

Claimant returned to South Point Medical Center on January 9, 2012, for treatment of his Type II diabetes. (Tr. at 608-09). His blood sugar level measured in the

400 to 500 range. (Tr. at 608). The treater noted that Claimant was alert and oriented with appropriate affect. (Tr. at 609). He was assessed with hyperlipidemia, hypertension, and uncontrolled Type II diabetes. (*Id.*)

Claimant's blood sugar was monitored on January 12, 19, and 26, 2012. (Tr. at 607). Throughout that time, Claimant's blood sugar measured in the 200 to 300 range. (*Id.*) Claimant informed his treater that he was following his diet closely. (*Id.*) Claimant's treater adjusted his Humalog intake as necessary. (*Id.*)

Claimant was examined by William Jennings, M.D., at Ebenezer Medical Outreach on January 25, 2012 for uncontrolled Type II diabetes. (Tr. at 649). Dr. Jennings noted that Claimant attempted an intensive insulin prescription, but Claimant failed to monitor his glucose level consistently. (*Id.*) Claimant described experiencing thirst, polyuria, and nocturia. (*Id.*) Dr. Jennings prescribed Levemir and provided Claimant with a Humalog algorithm. (*Id.*)

On February 16, 2012, Claimant underwent an x-ray of the cervical spine at Cabell Huntington Hospital. (Tr. at 635). The x-ray revealed that there was no fracture or subluxation. (*Id.*) However, mild degenerative disc disease with disc space narrowing at C5-C6 level with anterior and posterior osteophytosis was observed. (*Id.*)

Claimant returned to Ebenezer Medical Outreach on May 10, 2012, where he was seen by Jane George, C-FNP. (Tr. at 695). Claimant reported to Ms. George that his prior provider had instructed him to check his blood sugar eight times per day and he could not afford that many testing strips. (*Id.*) Claimant also indicated that he suffered from irritable bowel problems, hypertension, neck pain, arm pain, and back pain. (*Id.*) Ms. George recorded that Claimant was alert and in no acute distress, but he did have some weakness in his right hand grip. (*Id.*) Claimant was diagnosed with Type II

diabetes, hyperlipidemia, benign hypertension, and chronic neck pain and radiculopathy. (*Id.*) For his diabetes, Claimant was prescribed metformin and Levemir, and he was to continue using Humalog before meals. (Tr. at 696). He was also prescribed Neurontin for his neuropathy and pain, baclofen for muscle spasms, tramadol for pain, lisinopril for hypertension, and Nexium. (*Id.*)

On June 19, 2012, Claimant underwent an x-ray of his cervical spine at Cabell Huntington Hospital. (Tr. at 638). Mark Akers, M.D., found no evidence of fracture and noted that the alignment was normal. (*Id.*) Dr. Akers observed mild degenerative disc space narrowing and endplate hypertrophy at C5-C6 as well as moderate narrowing of the right C4 and C5 neural foramina. (*Id.*) He further noted mild right C6 foraminal narrowing and mild left C4 and C5 foraminal narrowing. (*Id.*)

The following day, Claimant returned to Ebenezer Medical Outreach and was seen by Suzy Tucker, MSN, for his neck pain. (Tr. at 692). With regard to his diabetes, Claimant reported that he changed his own insulin dosage as he felt was appropriate. (*Id.*) He also indicated that he had changed from Levemir to Lantus without medical advice. (*Id.*) As for his neck and back pain, Claimant indicated that Ultram offered some relief. (*Id.*) Claimant denied experiencing fatigue, chest pain, anxiety, or depression. (*Id.*) Ms. Tucker recorded that Claimant was alert and in no acute distress. (*Id.*) She observed that Claimant was able to move his extremities well, but he did have some pain with neck movement. (*Id.*) She assessed Claimant with uncontrolled Type II diabetes, hyperlipidemia, and benign hypertension. (*Id.*) Ms. Tucker noted that Claimant's hypertension was well controlled with medication. (*Id.*) She instructed Claimant not to change his medications without consulting a medical professional and informed him of ways to improve his cholesterol level by walking. (Tr. at 693). Claimant returned five

days later and was seen by Dr. Jennings. (Tr. at 691). No symptomatic changes were noted, and Dr. Jennings instructed Claimant to return in two months. (*Id.*)

On July 18, 2012, Claimant returned to Ebenezer Medical Outreach with complaints of elbow and wrist pain. (Tr. at 689). He also reported an occasional tingling sensation in his arms and fingers as well as continued neck and back pain. (*Id.*) Claimant denied experiencing fatigue, chest pain, anxiety, or depression. (*Id.*) He did report trouble sleeping due to stress and that there had been a recent death in his family. (*Id.*) Ms. Tucker noted that Claimant was alert and in no acute distress. (*Id.*) She further indicated that Claimant had documented C5 and C6 disc narrowing. (*Id.*) In addition, she recorded that Claimant had good movement of his extremities. (*Id.*) Claimant was prescribed Vistaril for sleep and instructed to follow up in three months. (Tr. at 690).

Claimant presented to Thomas Scott, M.D., on August 23, 2012, for complaints of neck pain, which Dr. Scott described as posterior with no radicular component. (Tr. at 678). Claimant reported the pain was constant, but decreased with the use of medication. (*Id.*) Upon examination, Claimant appeared heavily muscled and in good physical condition. (*Id.*) Dr. Scott observed that the range of motion of Claimant's shoulders was slightly limited due to pain, but he retained excellent upper extremity strength. (*Id.*) Dr. Scott noted that Claimant experienced tenderness in his posterior cervical musculature. (*Id.*) He recorded that x-rays and MRIs of Claimant's cervical spine were normal except for arthritic changes. (*Id.*) Claimant was assessed with cervical pain, which Dr. Scott opined was "probably related to osteoarthritis." (*Id.*) Dr. Scott determined that no operative treatment was indicated, and he advised Claimant to wear a soft collar neck brace and use ice packs. (*Id.*)

34

Claimant returned to Ebenezer Medical Outreach on September 17, 2012, and was seen by Dr. Jennings. (Tr. at 647). Dr. Jennings noted that Claimant forgot to bring his blood sugar monitoring records, but he reported no hypoglycemic events. (*Id.*) Dr. Jennings assessed Claimant with uncontrolled Type II diabetes and opined that the condition had improved some. (*Id.*) Claimant was prescribed blood glucose test strips, lisinopril, Levemir, Humalog, and metformin. (Tr. at 648). He was advised to return to see Dr. Jennings in one month. (Tr. at 647).

Two days later, Claimant was seen by Ms. Tucker at Ebenezer Medical Outreach. (Tr. at 686). Claimant was wearing a neck brace and continued to report pain in various areas. (*Id.*) He stated that he wanted disability due to his pain. (*Id.*) He also indicated that he was experiencing insomnia. (Tr. at 687). Ms. Tucker's findings were similar to those at Claimant's last visit with her. (Tr. at 686-87). She prescribed Vistaril to help Claimant sleep and instructed him to continue wearing the neck brace, as recommended by Dr. Scott. (Tr. at 687).

Claimant returned to Ebenezer Medical Outreach on October 22, 2012, and was seen by Dr. Jennings. (Tr. at 684). Claimant indicated that he had increased his activity by going for walks in the woods. (*Id.*) Dr. Jennings noted that Claimant had kept better records of his glucose levels and instructed Claimant to increase his Levemir dose at bedtime. (*Id.*) On December 3, 2012, Claimant reported to Dr. Jennings that he had recently gone hunting with his family. (Tr. at 645). He complained of continued pain and weakness in his arms. (*Id.*) Dr. Jennings noted that Claimant's diabetes was improving, and he prescribed Zithromax and Levemir. (*Id.*)

On December 20, 2012, Claimant was again treated by Ms. Tucker. (Tr. at 682). Claimant again reported ongoing neck pain and stated that he was there for prescription

refills. (*Id.*) He continued to wear a neck brace. (*Id.*) Ms. Tucker observed that Claimant was alert and in no acute distress. (*Id.*) Claimant was prescribed Zoloft for sleep issues as Vistaril did not help. (Tr. at 683). He was advised to use Ultram in the daytime for pain. (*Id.*)

Claimant visited Dr. Jennings next on January 14, 2013. (Tr. at 644). Claimant requested that Dr. Jennings complete a physical assessment form for his upcoming disability hearing. (*Id.*) Dr. Jennings completed the form, and he also noted that Claimant's diabetes continued to improve. (*Id.*) At a February 18, 2013 appointment, Dr. Jennings recorded that Claimant was not doing as well as he was at his last visit, possibly as a result of stress over the disability hearing. (Tr. at 710). Claimant indicated that he had been snacking on donuts to relieve stress. (*Id.*) Dr. Jennings increased Claimant's Levemir intake and his Humalog scale. (*Id.*)

Claimant returned to Dr. Scott on March 14, 2013 for increased pain from the neck to right shoulder and some radiating pain into the left shoulder. (Tr. at 697). Claimant indicated that he had been wearing a soft collar neck brace and taking ibuprofen, which afforded him little relief. (*Id.*) Dr. Scott's examination revealed some limited range of motion of the cervical spine. (*Id.*) He noted apparent discomfort, but no abnormalities. (*Id.*) Dr. Scott also observed tenderness in Claimant's right shoulder. (*Id.*) He opined that Claimant's symptoms were indicative of impingement in the rotator cuff of the right shoulder. (*Id.*) Claimant was provided with a referral for physical therapy evaluation and treatment. (*Id.*) That same day, Claimant visited Janet Payton at Ebenezer Medical Outreach for physical therapy in relation to his right shoulder. (Tr. at 705).

On April 18, 2013, Claimant was seen by Sandra Copley, M.D., at Ebenezer Medical Outreach for a checkup and medication refills. (Tr. at 702). Claimant appeared at the appointment using a cane on the right side. (*Id.*) He reported experiencing right-sided chest discomfort and swelling. (*Id.*) Dr. Copley indicated that these symptoms were from using the cane, although Claimant's wife stated that he did not use the cane often. (*Id.*) Claimant informed Dr. Copley that he continued to perform yardwork and household chores, but very slowly and with breaks. (*Id.*) He also reported feeling anxious. (*Id.*) Dr. Copley found that Claimant was alert and in no acute distress. (Tr. at 703). Dr. Copley recorded Claimant's weight as 213 pounds and his height as sixty-eight inches, which resulted in a body mass index of thirty-two. (Tr. at 702). During the examination, Claimant held his neck stiff and did not move it much. (Tr. at 703). Dr. Copley diagnosed Claimant with uncontrolled Type II diabetes, gastroesophageal reflux disease, hyperlipidemia, and benign hypertension. (*Id.*) Claimant was advised to return in three months. (*Id.*)

On February 20, 2014, Claimant underwent an MRI of his cervical spine at Cabell Huntington Hospital. (Tr. at 714). Donald Lewis, M.D., found disc bulging at C3-4, C4-5, and C6-7 with mild canal stenosis. (*Id.*) There was no evidence of neural foraminal compromise. (*Id.*) At C5-6, Dr. Lewis observed a superimposed left paracentral disc protrusion and a small herniated nucleus pulpous with suspected cord impingement. (*Id.*)

### C. Evaluations and Opinions

On July 12, 2011, Claimant underwent an independent medical examination with Prasadarao B. Mukkamala, M.D., for his workers' compensation claim. (Tr. at 559). Claimant alleged back pain that radiated into the left lower extremity as a result of an

injury he sustained while digging a ditch on April 7, 2011. (Tr. at 560). Claimant reported his activities of daily living were not affected by his symptoms, but he was limited in performing household activities. (Tr. at 562). He indicated that chiropractic treatment and physical therapy both helped to relieve his symptoms. (Tr. at 560). At the time of the examination, Claimant's medications included metformin, omeprazole, simvastatin, benazepril, tramadol, baclofen, Lantus, and Humalog. (Tr. at 561).

Upon examination, Dr. Mukkamala noted that Claimant was five feet seven inches tall and weighed 206 pounds. (Tr. at 567). Dr. Mukkamala noted that Claimant's upper extremities displayed normal range of motion in all joints with normal motor and sensory examination. (*Id.*) Claimant's grip strength was sixty pounds using a Jaymar dynamometer. (*Id.*) Dr. Mukkamala noted that Claimant's lower extremities revealed normal range of motion in all joints. (*Id.*) The sacroiliac joint maneuvers were painful on both sides; however, motor and sensory examinations were normal. (*Id.*) A straight leg raise test while sitting measured ninety degrees on both sides with no complaint. (*Id.*) The same test conducted while Claimant was supine measured twenty degrees on the right and ten degrees on the left with back pain. (*Id.*) Dr. Mukkamala observed no evidence of scoliosis, thoracic spine paraspinal muscle spasm, or lumbar spine paraspinal muscle spasm. (*Id.*) However, he did note bilateral thoracic paraspinal muscle and bilateral lumbar paraspinal lumbar muscle tenderness. (*Id.*) With respect to thoracic spine and lumbar spine range of motion, the measurements varied with repeated attempts and Claimant limited himself with range of motion due to complaints of pain. (Tr. at 568). Consequently, Dr. Mukkamala determined that neither test met validity criteria. (*Id.*) He observed that Claimant was able to ambulate independently and walked with antalgic gait. (*Id.*) Claimant was unable to squat or walk on his toes and

heels. (*Id.*)

Dr. Mukkamala recorded that Claimant's diagnosis was thoracic and lumbar sprain. (Tr. at 569). He opined that the treatment rendered up until that point had been necessary and appropriate to treat Claimant's workplace injury. (Tr. at 570). Notwithstanding, Dr. Mukkamala found that Claimant did not require further medical treatment with the exception of a home exercise program. (*Id.*) As such, the doctor determined that there was no indication for future office visits, medication, pain management, or therapy. (*Id.*) He concluded that Claimant should be able to return to work at a medium category work level with the caveat that Claimant be allowed to avoid frequent bending or twisting of his back. (*Id.*)

On November 3, 2011, Barbara Lewis, Ph.D., completed a Psychiatric Review Technique. (Tr. at 93). Dr. Lewis concluded that Claimant did not suffer from a medically determinable mental impairment. (*Id.*) In support of her conclusion, she cited a host of records from Dr. Young wherein he noted no symptoms of anxiety or depression. (*Id.*) She also cited records from Dr. Fredrick and South Point Medical Center evidencing no history of psychiatric care and normal psychiatric findings. (*Id.*) In addition, Dr. Lewis emphasized that Claimant's activities of daily living did not establish any mental limitations. (*Id.*)

On November 26, 2011, Alex Guerrero, M.D., completed a case analysis. (Tr. at 92-93). With regard to Claimant's back pain, Dr. Guerrero noted that x-rays of Claimant's thoracic spine were within normal limits and that Dr. Young's examination of Claimant on July 11, 2011 was "essentially [within normal limits] except for tenderness." (Tr. at 92). Consequently, Dr. Guerrero concluded that Claimant's alleged back condition was expected to resolve within twelve months or was non-severe. (Tr. at

92). As for Claimant's allegations of Type II diabetes, hypertension, and heart problems, Dr. Guerrero opined that the conditions were non-severe. (Tr. at 92-93).

On December 8, 2011, Claimant was scheduled for another independent medical examination with Dr. Mukkamala. (Tr. at 547). Claimant did not appear for the examination as scheduled and when contacted, he reported to Dr. Mukkamala that Dr. Young had advised him not to appear for the appointment.[6] (*Id.*) Nonetheless, Dr. Mukkamala performed a medical records review and concluded that his July 2011 opinion remained unchanged. (Tr. at 556). Dr. Mukkamala reiterated his belief that Claimant had achieved maximum medical improvement and that he did not require further treatment. (*Id.*)

Kip Beard, M.D., performed an Internal Medicine Examination for the Department for Disability Determination in Kentucky on December 22, 2011. (Tr. at 491-96). Claimant alleged diabetes, high blood pressure, heart disease, and chronic back and joint pain. (Tr. at 491). With respect to heart disease, Claimant stated that he had fifty-seven percent "blockage," but had never undergone a heart catheterization and never required any hospital visits for his heart. (*Id.*) He reported experiencing some left-side breast area chest numbness, pressure, and dull pain two to three times each week and indicated that rest relieved these symptoms. (*Id.*) As for his Type II diabetes, Claimant informed Dr. Beard that his blood sugar level was often greater than 200. (*Id.*) He stated that he had not been diagnosed with kidney disease or retinopathy diabetes, but complained that his fingers and toes tingled sometimes. (Tr. at 492). In relation to his neck and back, Claimant reported that both had bothered him since April 2011 after

---

[6] At a December 20, 2011 appointment, Dr. Young stressed that he did not advise Claimant to cancel the examination scheduled with Dr. Mukkamala. (Tr. at 591).

a workplace injury. (*Id.*) He described his neck and lower back pain as constant, sharp, and burning, and he stated that the pain extended to his arms and stomach. (*Id.*) Claimant indicated that his neck and back pain were made worse with bending and turning to the right. (*Id.*) As for joint pain, Claimant informed Dr. Beard that he experienced pain in his elbows, shoulders, hips, and knees, which was constant and made worse with lifting, walking, mowing the lawn, and weed eating. (*Id.*)

Upon examination, Dr. Beard recorded that Claimant was five feet seven inches tall and weighed 195 pounds. (Tr. at 493). Dr. Beard observed that Claimant presented without ambulatory aids and with a generally mildly stiff, but non-limping, gait. (*Id.*) Claimant was able to stand unassisted and step up and down from the examination table without difficulty. (*Id.*) He appeared comfortable while sitting, but mildly uncomfortable while supine. (*Id.*) Examination of Claimant's cervical spine revealed pain with tenderness and stiffness, but no paravertebral muscular spasm. (Tr. at 494). Flexion and extension of the cervical spine were fifty degrees, and rotation of the cervical spine was seventy degrees bilaterally. (*Id.*) In regard to Claimant's arms, Dr. Beard recorded complaints of pain on motion testing. (*Id.*) Dr. Beard observed some intermittent mild acromioclavicular crepitus and mild tenderness, but there was no redness, warmth or swelling. (*Id.*) Claimant was able to abduct both shoulders to 100 degrees and forward flex both shoulders to 110 degrees, with otherwise normal range of motion. (*Id.*) He had mild pain and tenderness in his elbows, but extension of both was measured to five and otherwise normal range of motion was found. (*Id.*) Claimant's wrists and hands were normal. (*Id.*) Dr. Beard noted that Claimant had mild pain and tenderness in his knees, but no warmth, redness, or swelling. (Tr. at 495). The right knee revealed slight to intermittent patellofemoral crepitus, but there was no limitation

on range of motion in either knee. (*Id.*) Claimant's feet and ankles were found to be normal. (*Id.*) Dr. Beard recorded that Claimant's dorsolumbar spine retained normal curvature. (*Id.*) Claimant complained of moderate pain with forward bending, and Dr. Beard found paravertebral tenderness, but no spasm, of the lumbar spine. (*Id.*) Dr. Beard observed that flexion of the lumbar spine was seventy degrees and that Claimant possessed otherwise normal range of motion. (*Id.*) Claimant could stand on one leg at a time with no problem. (*Id.*) Dr. Beard noted that a seated straight leg raise test was to ninety degrees bilaterally, and a supine straight leg raise test produced back discomfort at seventy degrees. (*Id.*) Dr. Beard also indicated that Claimant experienced hip pain on motion testing, but retained normal range of motion. (*Id.*) In addition, Dr. Beard found that manual muscle testing revealed 5/5 strength. (*Id.*) Claimant was able to walk on his heels and toe, perform tandem gait, and squat down approximately one-third of what was normal. (*Id.*)

Dr. Beard diagnosed Claimant with chronic arthralgia, osteoarthritis; chronic cervical, thoracic, and lumbosacral strain; Type II diabetes; hypertension; and chest pain, atypical for angina. (*Id.*) Dr. Beard remarked that Claimant's heart evaluation was unremarkable and that he did not find any evidence of other end organ damage that would be related to Claimant's hypertension or diabetes. (*Id.*) With respect to Claimant's neck and back symptoms, Dr. Beard reiterated that Claimant experienced moderate discomfort in both areas along with range of motion abnormalities, but retained symmetric reflexes and displayed no neurologic compromise. (Tr. at 496). As for Claimant's joints, there was some evidence of osteoarthritis and mild motion abnormalities, but Dr. Beard found no evidence of inflammatory arthritis. (*Id.*) Ultimately, Dr. Beard opined that the available data supported limitations in terms of

repetitive bending, heavy lifting, and repetitive squatting. (*Id.*)

Claimant appeared for another independent medical examination with Dr. Mukkamala on December 29, 2011. (Tr. at 518-46). Claimant insisted that he continued to experience neck and back pain, but he was getting better. (Tr. at 521). He informed Dr. Mukkamala that he had no problems with activities of daily living, although he was limited in terms of household activities. (*Id.*) Claimant also felt that he could go back to work in two months if he continued to receive physical therapy. (*Id.*) Dr. Mukkamala's examination of Claimant's neck revealed that his cervical spine range of motion varied with repeated attempts. (Tr. at 530). On his best attempt, Claimant's cervical spine flexion was twenty-seven degrees, extension was twenty-eight degrees, right lateral flexion was twenty-seven degrees, left lateral flexion was thirteen degrees, and rotation in both directions was approximately eighty degrees. (*Id.*) Dr. Mukkamala did not observe any paracervical muscle spasms, but did note bilateral paracervical muscle tenderness. (*Id.*) He recorded that Claimant was reluctant to move his upper extremities through full range of motion due to neck pain; however, range of motion in the upper extremities was otherwise normal. (Tr. at 531). Motor and sensory examination of the upper extremities was also normal. (*Id.*) As for Claimant's lower extremities, Dr. Mukkamala noted that range of motion in all joints was normal, but the sacroiliac joint maneuvers produced pain. (*Id.*) Motor and sensory examination of the lower extremities was normal. (*Id.*) With regard to Claimant's back, Dr. Mukkamala found no evidence of scoliosis. (*Id.*) No thoracic paraspinal muscle spasm or tenderness was observed. (*Id.*) Yet, there was some bilateral lumbar paraspinal muscle tenderness, with no spasm. (*Id.*) Dr. Mukkamala also observed vertebral tenderness in the midline in the low back. (*Id.*) A sitting straight leg raise test was negative, while a supine straight leg raise test was

positive at twenty degrees for both legs. (Tr. at 542). Dr. Mukkamala recorded that Claimant's sacral flexion, lumbar flexion, extension, right side bending, and left side bending were all restricted; however, he did note that lumbar spine range of motion varied with repeated attempts and that the lumbar spine flexion test did not meet validity criteria. (Tr. at 532, 541).

Dr. Mukkamala recorded that Claimant's diagnosis was thoracic and lumbar sprain. (Tr. at 533). He opined that Claimant had reached maximum medical improvement regarding his injury of April 7, 2011. (*Id.*) Dr. Mukkamala further concluded that Claimant would not require any further treatment except for a home exercise program. (Tr. at 534). He disagreed with Claimant's treating physician that further physical therapy was necessary given Claimant's "meager progress" with therapy. (*Id.*) As for Claimant's neck symptoms, Dr. Mukkamala opined that any neck injury was not a part of a compensable injury because there was no credible information indicating that Claimant injured his neck while working. (Tr. at 534-35).[7]

On January 14, 2013, Dr. Jennings completed a Physical Medical Assessment form. (Tr. at 630-33). Dr. Jennings opined that Claimant's impairments prevented him from occasionally lifting more than one pound (up to one-third of a workday) and frequently lifting more than one-half pound (up to two-thirds of a workday). (Tr. at 630). Dr. Jennings further indicated that Claimant could stand or walk for a total of ten

---

[7] On March 19, 2012, A. Rafael Gomez, M.D., completed a case analysis. (Tr. at 103). In his case analysis, Dr. Gomez stated that he had reviewed all of the evidence in Claimant's file and that "the PRFC of 01/14/12 is affirmed as written." (*Id.*) There is no physical RFC assessment from January 14, 2012 in the record. Dr. Gomez might have been referencing the January 4, 2012 decision by Single Decisionmaker Sharon Clark, wherein she concluded that Claimant was not disabled since he possessed the RFC to perform past relevant work as a carpenter. (Tr. at 95-96). Even then, the summary of Ms. Clark's report contained in the record does not describe any of Claimant's exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 95). Instead, the summary merely states that Claimant retains the RFC to perform past relevant work as a carpenter. (*Id.*)

minutes in an eight-hour workday (or twenty minutes without interruption),[8] and sit for twenty minutes without interruption. (Tr. at 630-31). As for postural limitations, Dr. Jennings concluded that Claimant could never climb, balance, stoop, crouch, kneel, or crawl. (Tr. at 631). Dr. Jennings further opined that Claimant could never reach or handle on his right side, and he could never push or pull with either side; however, he had no limitation as to feeling. (Tr. at 632). In addition, Dr. Jennings found that Claimant had no communicative limitations. (*Id.*) With respect to environmental limitations, Dr. Jennings determined that Claimant could never be exposed to heights, moving machinery, temperature extremes, chemicals, dust, or fumes. (Tr. at 633). On the other hand, Claimant had no limitations as to noise, humidity, or vibration exposure. (*Id.*) On the section of the form requesting that the physician list medical any findings that support the physician's opinions, Dr. Jennings wrote "[p]lease see my attached orthopedic evaluation report for supporting explanation." (*Id.*) There is no such report in the record.

On June 26, 2013, Michael Kilkenny, M.D., examined Claimant for the Medical Review Team of the West Virginia Department of Health and Human Resources. (Tr. at 698-700). Dr. Kilkenny noted that Claimant weighed 210 pounds at that time and that Claimant's speech, posture, and gait were all normal. (Tr. at 698). Claimant reported that he experienced pain in his neck and low back as well as thoracic pain that radiated into his right arm. (Tr. at 699). Dr. Kilkenny diagnosed Claimant with back pain and abdominal hernia. (Tr. at 699). Dr. Kilkenny determined that Claimant should avoid work situations that would involve lifting, climbing, walking, or prolonged sitting or standing. (*Id.*) Moreover, Dr. Kilkenny opined that Claimant was unable to work full-

---

[8] As the Commissioner notes, these opinions appear to conflict.

time at his "customary occupation or like work" because he was unable to sit or stand for prolonged periods, lift, climb, or walk distances. (*Id.*) Dr. Kilkenny further concluded that Claimant was unable to perform other full-time work for the same reasons. (*Id.*) He determined that Claimant's inability to work full-time was long term. (*Id.*) In addition, Dr. Kilkenny opined that Claimant should not be referred for vocational rehabilitation. (Tr. at 700).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

46

## VII.   Discussion

### A. Duty to Develop the Record

Claimant contends that the ALJ failed to fully develop the record with regard to his thoracic, cervical, and lumbar spine pain, shoulder pain, Type II diabetes, hypertension, and osteoarthritis. (ECF No. 10 at 13). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [his] multiple medical problems," the ALJ could not properly analyze his impairments as required by the Regulations. (*Id.* at 15). Having reviewed the record in full, the undersigned finds that this argument lacks merit.

Certainly, an ALJ has the duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). However, an ALJ is not required to act as a claimant's counsel. *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (unpublished table decision) (citing *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)). The ALJ has the right to presume that a claimant's counsel presented the strongest case for benefits. *Nicholson v. Astrue,* 341 F. App'x 248, 253 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)). Ultimately, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

Indeed, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps

that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Id.* at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

In this case, Claimant, who was represented by counsel at his administrative hearing, has neglected to identify any evidentiary gaps in the record. *See Nye v. Colvin*, No. 3:13-12115, 2014 WL 2893199, at *20 (S.D.W.Va. June 26, 2014) (rejecting identical argument where claimant did not identify evidentiary gaps). Furthermore, he has entirely failed to proffer what evidence could have been adduced that might have changed the result of the proceedings. *See Scarberry v. Chater*, 52 F.3d 322, 1995 WL 238558, at *4 n.13 (4th Cir. Apr. 25, 1995) (unpublished table decision) (rejecting failure to develop record argument where claimant did not "identify what the missing evidence would have shown"). The ALJ reviewed Claimant's extensive medical records, scrutinized the opinions provided by Claimant's physician and other examining sources, obtained physical and mental assessments from agency experts, and considered both Claimant's testimony and a function report provided by his wife. *See Toney v. Shalala*, 35 F.3d 557, 1994 WL 463427, at *2 (4th Cir. Aug. 29, 1994) (unpublished table decision) (holding record was adequately developed where ALJ considered examination reports, medical opinions, claimant's testimony, medical records, and vocational expert testimony). Indeed, the record contains over 300 pages of medical record and opinion

evidence alone, which spans over eight years. The medical records and opinion evidence considered by the ALJ certainly encompassed Claimant's allegations related to his thoracic, cervical, and lumbar spine pain, shoulder pain, Type II diabetes, hypertension, and osteoarthritis.[9] (Tr. at 15-22). Claimant's argument boils down to circular logic—the record could not have been well-developed because his application for benefits was denied, and his application was denied because the record was incomplete. That will not suffice for remand. Ultimately, the record was well-developed and certainly provided more than adequate information upon which the ALJ could properly evaluate Claimant's application for benefits. An adverse decision alone does not entitle Claimant to a remand for further factual development. Accordingly, the undersigned **FINDS** that the ALJ did not err by failing to more fully develop the record.

### B. The ALJ's Evaluation of Opinion Evidence

As mentioned above, interspersed in Claimant's development of the record argument is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians," in violation of applicable law. (ECF No. 10 at 14). More particularly, Claimant asserts that the ALJ "ignored" the opinions of Dr. Beard, Dr. Jennings, and Dr. Kilkenny. (*Id.* at 15).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable

---

[9] While Claimant's hypertension and shoulder pain were not found to be severe by the ALJ, the written decision reflects that the ALJ considered those conditions throughout.

medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[10] listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. § 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and

---

[10] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.[11]

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2. What an individual's RFC is;

3. Whether an individual's RFC prevents him or her from doing past relevant work;

---

[11] Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

First, Claimant argues that the ALJ "ignored" Dr. Jennings's opinion as to Claimant's physical limitations. (ECF No. 10 at 14-15). Specifically, Claimant emphasizes Dr. Jennings's opinion that he should never climb, balance, stoop, crouch, kneel, crawl, reach to the right, handle on his right side, or push and pull with either upper extremity. (ECF No. 10 at 14; Tr. at 631-32). In addition, Claimant stresses that Dr. Jennings concluded he should not be exposed to heights, moving machinery, extreme temperatures, dust, or fumes. (ECF No. 10 at 14; Tr. at 633). The ALJ assigned little weight to Dr. Jennings's opinions because the limitations he provided were not supported by objective clinical or laboratory findings. (Tr. at 23). The ALJ further explained that Claimant presented "no significant evidence of neurologic compromise," that would affect Claimant's ability to stand, walk, or sit to the extent that Dr. Jennings

opined. (*Id.*) In addition, the ALJ asserted that Dr. Jennings failed to cite any specific medical findings on the Physical Medical Assessment form and that Dr. Jennings's opinion was not supported by the medical record, which "indicate[d] only routine outpatient care, with little or no continuing treatment or use of prescribed medication." (*Id.*) Finally, the ALJ found that the limitations provided in Dr. Jennings's opinion were inconsistent with Claimant's activities of daily living. (*Id.*)

Contrary to Claimant's contention, the ALJ clearly did not ignore Dr. Jennings's opinion. To the contrary, the ALJ summarized Dr. Jennings's opinion and provided multiple reasons for assigning it little weight. (*Id.*) Those reasons are supported by substantial evidence. First, Dr. Jennings's opinion was devoid of support from the medical records created during his treatment relationship with Claimant. Dr. Jennings exclusively treated Claimant for his Type II diabetes. In December 2012, Claimant reported to Dr. Jennings that he was experiencing pain in both arms and a problem with his neck, but Dr. Jennings apparently did not treat those conditions or *even physically examine* Claimant with respect to those complaints. (Tr. at 645). At the administrative hearing, Claimant described Dr. Jennings as his "diabetic doctor" and testified that Dr. Jennings only prescribes him medication for his diabetes. (Tr. at 61-62). Second, as the ALJ pointed out, Dr. Jennings failed to do anything other than check boxes on the Physical Medical Assessment form. He provided no explanation for the severe physical limitations that he assigned to Claimant, and in particular, Dr. Jennings failed to assert how the sole condition that he treated Claimant for (Type II diabetes) could require such stringent limitations. Third, the severity of Dr. Jennings's opinions is especially striking when one considers that Claimant informed the doctor that he had been going for walks in the woods and hunting around the time that Dr. Jennings completed the form. (Tr. at

645, 684). In addition to partaking in those activities, the ALJ also recognized that Claimant was able to care for his personal needs and perform both inside and outside chores, albeit slowly and with breaks.[12] (Tr. at 22-23).

Furthermore, as the ALJ emphasized, clinical and laboratory findings from other treaters and examiners did not support the limitations provided by Dr. Jennings. (Tr. at 23). To recapitulate some of the evidence summarized by the ALJ, in May 2010, a stress test and myocardial perfusion test were both negative. (Tr. at 15-16, 421-22). May 2011 x-rays of Claimant's cervical, thoracic, and lumbar spine resulted in a diagnosis of a thoracic sprain. (Tr. at 19, 372). That same month, an MRI of Claimant's thoracic spine revealed only minimal degenerative changes in the mid and lower dorsal spine and at the cervicothoracic junction, with no evidence of canal stenosis, neural impingement, or disc herniation. (Tr. at 19, 656). In June 2011, Claimant's physical therapist noted that Claimant was making good progress and that Claimant's mid thoracic pain was decreasing with exercise. (Tr. at 19, 513). Dr. Mukkamala examined Claimant the following month and concluded that Claimant did not require further medical treatment except for a home exercise program. (Tr. at 19, 570). On August 9, 2011, Dr. Chongswatdi noted that Claimant experienced no neurological deficits and retained good range of motion with some pain in his thoracic spine. (Tr. at 19, 432). Dr. Chongswatdi observed that Claimant had been released to work and was tolerating it well with his medications. (Tr. at 19, 432). Later that month, Claimant reported experiencing a burning sensation from his neck down his arms, neck pain, nausea, dizziness, and vomiting after bending over to rake concrete at work. (Tr. at 20, 426). Dr.

---

[12] The ALJ stated that Claimant was also able to care for his young children; however, there is no evidence in the record that Claimant has young children. (Tr. at 23). Claimant does have grandchildren, but it is not clear that he takes care of them, and his wife reported that his symptoms prevented him from playing with his grandchildren, which he was able to do in the past. (Tr. at 238).

Chongswatdi opined that the nausea and dizziness could be related to exhaustion and dehydration. (Tr. at 20, 427). He further opined that Claimant could have suffered a muscle strain in the neck causing his other symptoms. (Tr. at 427). He recommended treating the injury conservatively with medication and physical therapy. (Tr. at 20, 427).

In November 2011, an MRI of the lumbar spine displayed only mild degenerative changes and no acute bone injury, focal disc herniation, or significant acquired spinal canal stenosis. (Tr. at 20, 655). In December 2011, Dr. Young found that Claimant's symptoms had rapidly improved with physical therapy and that Claimant's neck range of motion was less painful. (Tr. at 20, 592). That same month Dr. Mukkamala again examined Claimant and concluded that he had did not require any further treatment (other than a home exercise program) for his back injury. (Tr. at 534). Dr. Beard also examined Claimant that month. (Tr. at 29, 491). Dr. Beard noted that Claimant's gait was mildly stiff, but he did not require an ambulatory aid. (Tr. at 493). Claimant appeared comfortable while seated, and he was able to arise from his seat and step up and down from examination table without issue. (*Id.*) Dr. Beard recorded that there was some stiffness, pain, and tenderness of the cervical spine, but no paravertebral muscular spasm. (Tr. at 20, 494). He noted that Claimant reported moderate pain while bending forward, but there was no evidence of lumbar spine paravertebral spasm and range of motion of the lumbar spine was normal other than flexion being limited to seventy degrees. (Tr. at 21, 495). Claimant was also able to stand on one leg at a time without issue, and a seated straight leg raise test was negative. (Tr. at 21, 495). Dr. Beard observed no neurologic compromise. (Tr. at 21, 495-96). As for Claimant's shoulders, Dr. Beard observed some intermittent mild acromioclavicular crepitus and mild tenderness, but there was no redness, warmth, or swelling. (Tr. at 494). Claimant was

55

able to abduct both shoulders to 100 degrees and forward flex both shoulders to 110 degrees, with otherwise normal range of motion. (*Id.*) With respect to Claimant's elbows, Dr. Beard noted that Claimant had mild pain and tenderness, but extension of both elbows was measured to five and otherwise normal range of motion was found. (Tr. at 494). Dr. Beard further noted that Claimant's wrists and hands were normal. (*Id.*) As for Claimant's Type II diabetes, Claimant stated that he had not been diagnosed with kidney disease or retinopathy diabetes, and Dr. Beard observed no evidence of end organ damage related to that condition. (Tr. at 491-92, 495).

Although Claimant reported an increase in neck pain to Dr. Young in January 2012, an x-ray of Claimant's cervical spine in February 2012 showed no fracture or subluxation. (Tr. at 21, 593, 635). However, mild degenerative disc disease with disc space narrowing was seen at the C5-C6 level with anterior and posterior osteophytosis (bone spurs). (Tr. at 21, 635). A June 2012 x-ray of Claimant's cervical spine exhibited no evidence of fracture. (Tr. at 21, 638). However, the x-ray did show mild degenerative changes with neural foraminal narrowing on the right at C4, C5, and C6, and on the left at C4 and C5. (Tr. at 21, 638). At an appointment with Ms. Tucker that same month, Claimant continued to report neck pain, but indicated that pain medication provided him some relief. (Tr. at 692). Ms. Tucker also indicated that Claimant's hypertension was controlled by medication at that time. (*Id.*) In August 2012, Dr. Scott examined Claimant for neck and back pain and found that Claimant had somewhat limited range of motion of his spine, possibly ten degrees less than normal. (Tr. at 21, 678). After reviewing radiological studies of Claimant's cervical spine, Dr. Scott concluded that the studies were normal with the exception of some arthritic changes. (Tr. at 21, 678). Dr. Scott opined that operative treatment was not indicated and that Claimant should

obtain a soft collar neck brace in addition to using ice packs. (Tr. at 21, 678). In October 2012, Claimant informed Dr. Jennings that he had been going for walks in the woods, and in December 2012, Claimant reported to Dr. Jennings that he had recently gone hunting with his family. (Tr. at 645, 684). At an appointment with Dr. Scott in March 2013, Dr. Scott noted that Claimant had some limited range of motion in cervical spine, but observed no abnormalities. (Tr. at 22, 697). Dr. Scott again opined that Claimant's cervical spine radiological studies were normal and referred him to physical therapy for a possible right shoulder rotator cuff impingement. (Tr. at 22, 697). Claimant apparently attended physical therapy that month, but there is no record evidence demonstrating that Claimant continued to attend. (Tr. at 705). The following month, Claimant appeared at an appointment with Dr. Copley using a non-prescribed cane to ambulate. (Tr. at 702). Notwithstanding, he informed Dr. Copley that he was still performing inside and outside chores, and Dr. Copley observed that Claimant was in no acute distress. (Tr. at 22, 702-03). Finally, a February 2014 MRI of Claimant's cervical spine showed disc bulging at C3-4, C4-5, and C6-7 with mild canal stenosis. (Tr. at 714). There was no evidence of neural foraminal compromise. (*Id.*) However, observed at C5-6 were a superimposed left paracentral disc protrusion and a small herniated nucleus pulpous with suspected cord impingement. (*Id.*)

After reviewing all of this evidence (other than the February 2014 MRI that postdates the ALJ's decision), the ALJ observed that Claimant's neck and back pain did not cause him to experience strength deficits, circulatory compromise, or neurological deficits, which the ALJ asserted were often associated with severe or intense pain and physical inactivity. (Tr. at 22). The ALJ also noted that Claimant had responded well to treatment and acknowledged that although Claimant had previously stated that

medication did not help his symptoms, it was hard to believe that Claimant would continuously seek refills of his medications if the medications did not provide some relief. (Tr. at 23). With respect to Claimant's diabetes, the ALJ stressed that Claimant reported sometimes not taking his insulin as prescribed and that at least one treater described Claimant as noncompliant with his diabetes treatment plan. (Tr. at 22-23). In addition, the ALJ emphasized that Claimant had not been diagnosed with a kidney disease as a result of his diabetes. (Tr. at 17). As for Claimant's hypertension, the ALJ recognized that a 2010 stress test was negative and that one of Claimant's treaters noted that his blood pressure was controlled with medication. (Tr. at 15-16).

Overall, the undersigned **FINDS** that the ALJ provided good reasons for assigning little weight to Dr. Jennings's opinion and that the ALJ's determination is supported by substantial evidence. As stated above, Dr. Jennings treated Claimant solely for his diabetic condition and failed to cite any clinical findings that would support the strict limitations that he opined were necessary for Claimant. More particularly, Dr. Jennings neglected to relate Claimant's Type II diabetes to the physical limitations that he found were appropriate. In addition, the clinical and laboratory findings as a whole, including radiological studies, demonstrate that Claimant's symptoms are relatively mild and that they can be relieved to some extent by conservative treatment, such as medication or physical therapy. Furthermore, Claimant's activities of daily living, including going hunting, going for walks, and performing chores, are somewhat inconsistent with Dr. Jennings's opinion.

Claimant next argues that the ALJ "ignored" Dr. Kilkenny's opinion that he could not work at his past occupation due to his inabilities to sit or stand for prolonged periods of time, lift, or climb. (ECF No. 10 at 14-15). Claimant also highlights Dr.

Kilkenny's determination that Claimant would be unable to perform any other full-time work for the same reasons.[13] (*Id.* at 14). In addressing Dr. Kilkenny's opinion, the ALJ preliminarily recognized that his opinion as to Claimant's ability to work invaded the province of the Commissioner. (Tr. at 23). Notwithstanding, the ALJ considered the opinion and assigned it little weight because it was based on Claimant's subjective complaints, which the ALJ found were not entirely credible, and it was inconsistent with the medical record. (Tr. at 22-23).

To begin, the undersigned notes that Dr. Kilkenny's opinion is not subject to the "treating physician rule" described above because Dr. Kilkenny was only an examining physician, not a treating physician. In addition, the ALJ correctly pointed out that Claimant's ability to return to past relevant work, or to work at all, are issues reserved to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. However, as the ALJ noted, Dr. Kilkenny did provide some opinions as to Claimant's functional limitations, including his ability sit, stand, lift, and climb. (Tr. at 23, 699). The ALJ recognized both categories of opinions (those reserved to the Commissioner and those not) and assigned them little weight. Implicit in the ALJ's determination that Dr. Kilkenny's opinion was based on Claimant's subjective complaints is the recognition that Dr. Kilkenny failed to support his opinion with any objective findings. (Tr. at 699). In fact, it is unclear that Dr. Kilkenny reviewed any other medical records, including radiological studies, before arriving at his opinion. Instead, it appears that Dr. Kilkenny based his opinion on Claimant's complaints of neck and back pain during a physical examination, which Dr. Kilkenny cursorily noted. (Tr. at 698-99). To the extent that Dr. Kilkenny's opinion relies on Claimant's subjective complaints, the ALJ properly used that as a reason to

---

[13] Dr. Kilkenny did not define what amount of time constitutes a "prolonged period."

discount the opinion since the ALJ provided specific reasons for finding that Claimant was only partially credible. For instance, as noted above, the ALJ discussed Claimant's statement that medication did not help his symptoms, but that he continued to seek refills of his medications. (Tr. at 23). In addition, the ALJ found that Claimant was only partially credible because his reported activities of daily living were inconsistent with the level of impairment that he alleged. (Tr. at 22-23). Furthermore, as discussed above in addressing Dr. Jennings's opinions, the medical evidence as a whole does not support the severe limitations imposed by Dr. Kilkenny. Similarly, Dr. Kilkenny's assertion that Claimant cannot work at all is certainly not supported by the record, and the ALJ properly rejected that opinion. Accordingly, the undersigned **FINDS** that the ALJ provided good reasons for assigning little weight to Dr. Kilkenny's opinion and that the ALJ's determination is supported by substantial evidence.

Finally, Claimant insists that the ALJ "ignored" Dr. Beard's opinion that Claimant could not repetitively bend, squat, or perform heavy lifting. (ECF No. 10 at 14-15). In his written decision, the ALJ summarized Dr. Beard's findings and his opinions, including those related to repetitive bending, heavy lifting, and repetitive squatting. (Tr. at 20-21, 23-24). The ALJ "adopt[ed]" Dr. Beard's opinion and found that it was consistent with the objective medical evidence. (Tr. at 24). Clearly then, the ALJ did not ignore, or reject at all, Dr. Beard's opinion. The ALJ's RFC finding reflects the adoption of Dr. Beard's opinion. The ALJ limited Claimant to only frequently, but not repetitively, stooping and crouching. These limitations encompassed Dr. Beard's opinion as to bending and squatting. *See* SSR 85-15, 1985 WL 56857, at *2 (stating that bending spine alone constitutes stooping and bending both spine and legs constitutes crouching); SSR 83-14, 1983 WL 31254, at *2 (stating that there are two types of bending in medium exertional

level work: stooping, which is "bending the body downward and forward by bending the spine at the waist," and crouching, which is "bending the body downward and forward by bending both the legs and spine."); *see also Pierce v. Colvin*, No. 7:12-CV-129-D, 2013 WL 3326716, at *9 (E.D.N.C. July 1, 2013) (recognizing that neither Regulations nor Rulings define "squat," but that squat is synonymous with crouch, which is defined by Rulings). As for Dr. Beard's opinion that Claimant could not repetitively perform heavy lifting, which was undefined by Dr. Beard, the ALJ limited Claimant to medium exertional level work. As defined by the Regulations, medium exertional work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). The ALJ's RFC finding does not require Claimant to engage in repetitive heavy lifting (in fact, heavy exertional work is the next exertional level after medium work), and thus, the ALJ appropriately crafted Claimant's RFC in accord with Dr. Beard's opinion. To the extent that Dr. Beard had some idea of heavy lifting in mind other than the exertional categories provided by the Regulations, the vocational expert testified that there were also light exertional level jobs available for an individual with an otherwise identical RFC, and the ALJ noted this in his written decision. (Tr. at 25, 82-83). Light work requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). As the ALJ found, Claimant could certainly perform light work without running afoul of Dr. Beard's physical limitations opinion. Accordingly, the undersigned **FINDS** that Claimant's argument with respect to the ALJ's analysis of Dr. Beard's opinion is without merit. The ALJ's written decision reflects that he properly considered Dr. Beard's opinion and incorporated the limitations set forth by Dr. Beard in the RFC finding.

## C. Combination of Impairments Equivalent to a Listing

Finally, Claimant asserts that "the totality of [his] medical and mental problems, when combined, totally disable him and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability."[14] (ECF No. 10 at 15-16). Claimant further insists that "[t]he overwhelming and contradicted competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical impairments render him unable to function for 8 hours in any type of job."[15] (*Id.* at 16).

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment

---

[14] Claimant generally mentions "mental problems," but does not cite any evidence of mental problems in his discussion of the issue. (ECF No. 10 at 16). He does not dispute the ALJ's finding that his alleged mental impairments are non-severe. (Tr. at 16). While the undersigned notes that the ALJ did not utilize the special technique for evaluating mental impairments when he declined to explicitly discuss the four functional areas described in the Regulations, Claimant has not raised the issue. *See* 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4) (requiring ALJ's written decision to include specific findings as to degree of limitations in each functional area). Although the ALJ may have concluded that a specific functional area analysis was unnecessary because Claimant did not have a medically determinable mental impairment, at least one (unidentified) treater diagnosed Claimant with situational depression and prescribed him medication for that condition in October 2011. (Tr. at 611). On the other hand, in November 2011, Dr. Lewis concluded that Claimant did not suffer from a medically determinable mental impairment. (Tr. at 93). Because Claimant did not raise the issue, **that should be the end of the matter**. Nevertheless, reviewing the record as a whole, Claimant generally did not express to his treaters that he was experiencing any mental health issues, such as depression or anxiety, and he never sought treatment specifically for any mental health issues. (Tr. at 68, 374, 412, 584, 609). As the ALJ pointed out, it does not appear that any alleged mental health symptoms affect Claimant's overall ability to function, which is evidenced by his ability to care for himself, help around the house, and interact with others without difficulty. (Tr. at 16, 241-42, 257, 259). Accordingly, assuming that the ALJ erred in not expressly discussing each of the four functional areas, and assuming that the harmless error doctrine applies to such errors, the ALJ's failure was harmless. *See Pepper v. Colvin*, 712 F.3d 351, 365-67 (7th Cir. 2013) (applying harmless error analysis to ALJ's failure to "explicitly apply" special technique); *Lazore v. Astrue*, 443 F. App'x 650, 653 (2d Cir. 2011) (holding that failure to expressly discuss each of the four functional categories provided in 20 C.F.R. § 404.1520a(c)(4) was harmless where ALJ otherwise discussed claimant's mental limitations); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 657 (6th Cir. 2009) (holding that harmless error analysis applies to ALJ's failure to follow special technique). *But see Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011) (holding that failure to comply with special technique is not harmless if claimant has "colorable claim of mental impairment"). The ALJ undoubtedly would have reached the same result had he performed the functional analysis required by the special technique. *See Moore v. Colvin*, No. 2:14-cv-09913, 2015 WL 1481732, at *6-*7 (S.D.W.Va. Mar. 31, 2015) (describing harmless error doctrine).

[15] In this challenge, Claimant again attacks the ALJ's analysis of the opinion evidence, which is an argument that the undersigned rejects above.

included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* §§ 404.1525, 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *see also* 20 C.F.R. §§ 404.1526, 416.926. Under the applicable Regulations, the ALJ may find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listed impairment, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, then equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria; (2) if the claimant's impairment is not described in the Listing, then equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment; or (3) if the claimant has a

combination of impairments, no one of which meets a listed impairment, then equivalency can be proven by comparing the claimant's findings to the most closely analogous listings. If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar impairment. 20 C.F.R. §§ 404.1526(b), 416.926(b). However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

Contrary to Claimant's assertion, however, there is no "combination of impairments" listing. Instead, the Supreme Court has explained that "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19, 1983 WL 31248).[16] "This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 710 (6th Cir. 2013) (citing *Zebley*, 493 U.S. at 532). Thus, to

---

[16] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zebley* remains relevant to this case.

determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. Accordingly, Claimant's assertion that "competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical and mental impairments render him unable to function for 8 hours in any type of job," (ECF No. 10 at 16), is insufficient to establish that his combination of impairments is equivalent to a listed impairment that would warrant a finding of disability. In sum, Claimant has failed to identify any specific listing that his impairments meet or equal, and his functional impact argument is unavailing. *See Nye*, 2014 WL 2893199, at \*24-\*25 (rejecting identical argument). Therefore, the undersigned **FINDS** that this challenge to the Commissioner's decision is without merit.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the

date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 10, 2015.

Cheryl A. Eifert
United States Magistrate Judge

66